### ANNA M. GRAY v. COMMUTATOR COMPANY.[1]

February 28, 1902.

Nos. 12,852—(181).

**Master and Servant—Safe Appliances.**

It is the duty of the master to furnish reasonably safe machinery for the use of the servant in the performance of the duties he undertakes in the master's service, and it is in the first instance to be presumed that the machinery so furnished is safe, and free from dangers of which the servant has no notice.

**Same—Contributory Negligence.**

In such a case the servant has the right to act upon the assumption that the master, has done his full duty in this respect, and should not be charged with contributory negligence in making use of the machinery furnished for that purpose.

**Same—Duty of Master.**

The master's duty and liability in respect to furnishing safe machinery extend not only to avoid the imposition on the servant of such unnecessary and unreasonable risks as are in fact known to him, but to such as the master ought to have known, in the exercise of diligence on his part.

**Same—Extrahazardous Machinery.**

If there exist obscure conditions and peculiar attributes in the machinery furnished, increasing the hazards of the service, it is the duty of the master to give the servant ample warning and information con-

[1] Reported in 89 N. W. 322.

cerning the same, and a failure to do so is a violation of the duty of the master, for which he may be liable in case injury should occur by reason thereof.

## Assumption of Risk.

While the lack of specific warnings or instructions in regard to the operation of a piece of machinery would not absolve a servant from responsibility for the assumption of the risk which, with the exercise of ordinary intelligence, he could have known or appreciated, this is ordinarily a question of fact for the determination of the jury upon all the circumstances of the case.

## Verdict Sustained by Evidence.

Evidence in this case considered, and *held*, that it supports a verdict in favor of plaintiff for injuries to her son, suffered while working as an employee upon a dangerous machine, for the reason that the evidence tends to show that he had no notice of the precise risk through which such injuries were sustained.

## Damages not Excessive.

The verdict of $5,000 in this case *held* not excessive.

Action in the district court for Hennepin county by plaintiff for the benefit of Frank Gray, her minor son, to recover $5,000 for personal injuries. The case was tried before Elliott, J., and a jury, which rendered a verdict in favor of plaintiff for the sum demanded. From an order denying a motion for judgment in its favor notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*Morton Barrows*, for appellant.

*John Hay*, for respondent.

LOVELY, J.

Action by the mother (the father being dead), for the benefit of her minor son, to recover for injuries suffered by · him in the employ of defendant while at work upon a mechanical contrivance for pressing metal bars, described as a "drawing machine." Plaintiff had a verdict. Upon a settled case defendant moved for judgment, or for a new trial in the alternative. This motion was denied, and defendant appeals.

The complaint sets forth substantially that the defendant negligently provided for the use of plaintiff's son an unsafe and de-

fective "drawing machine"; that the machine, when in good condition and repair, was very dangerous, and difficult to operate; that the dangers and risks of operating it were within the knowledge of defendant, but not known to the employee, and could not be understood or appreciated by the exercise of reasonable and ordinary diligence, yet defendant failed and neglected to explain or make known to him such dangers or risks, whereby, in its operation in the usual way, the injuries were sustained.

The verdict requires us to adopt the following conclusions: Defendant was engaged in the manufacture of an electrical device known as a "commutator," an instrument for governing the electric current. It is composed of a large number of segments, or bars of metal, each several inches in length, and quite thin. Great care is requisite to have these segments finished with the utmost mathematical precision. They are, in the first stage of manufacture, molded into the form desired, and then completed by pressure in the drawing machine in order to shape them to the exact angle and degree of thinness requisite for use in the commutators. There were only two such "drawing machines" in the country, each designed and used by the defendant for this particular work, both complicated in structure, ponderous in size, and capable of immense power in pressure upon the softer metals which composed the segments. It was while operating one of these machines that the plaintiff's son, Frank, received the injuries for which this action is maintained.

The injured party was a young man nineteen years of age, of not more than ordinary intelligence. He left school at the age of fifteen; worked on a farm. Two years afterwards he went to work in the shop of defendant company. He there operated one of the drawing machines, and worked upon it for a month. For two or three weeks in 1899 he worked on the machine upon which he was hurt. About the middle of August, 1900, he resumed charge of this machine, and operated it continually from that time for two-thirds of each day until November 10, 1900, when the accident occurred. The remaining one-third of the time he was engaged in operating the other and similar machine in the same shop.

Much time on the argument was devoted to a description of the "drawing machine," with the aid of photographs and a model, through which the court was enabled to understand its characteristics and action quite thoroughly, but we do not deem it necessary for an essential understanding of the legal grounds upon which we find it necessary to decide this case to give more than a mere outline of portions of the machine directly involved in the accident. To do more, if we could,—which is doubtful,— would obscure, rather than illustrate, the legal results we have reached.

These two drawing machines, designed and manufactured by defendant, as before stated, were the only two of the kind in use. Hence an explanation of their parts requires us to describe and name them somewhat crudely from analogy to similar objects. The appliance which directly caused the injury was a large, heavy, triangular mass of metal, suspended in the central part of the machine upon a pivot at its apex, and by the force of applied power made to swing to and fro in the line of an arc over a horizontal bed beneath. Its movements in this respect resembled a pendulum, and it will be so designated. The lower face of this pendulum was several inches wide, having a convex surface covered with steel. It had a range of movement back and forth, when in action, of about twenty-four inches. The bed referred to was held in place by supports of steel (called "arms") on either side, so constructed as to move back and forth under the convex surface of the pendulum in a contrary direction but simultaneously therewith, resembling very much in character and movement the platen of a printing press.

In preparing this machine for use to draw or fashion the segments into proper shape, a steel disc had to be adjusted to the surface of the platen, to bring the face of the disc so near the pendulum that when the latter swung over it there would be the exact space between the pendulum and the disc to secure by pressure, under the united movement of both, the necessary thinness as well as ultimate shape and angle of the segment. While the motive power running the machine was a small gasoline engine, the regulation of the swing of the pendulum and the move-

ment of the platen was a treadle controlled by the foot of the
operator in working the same. The operator, in the performance
of his duties, was required to sit in front of the pendulum, and
press his foot upon the treadle, which would cause the pendulum
and platen each to make one full movement back and forth. This
movement, by which one segment would be pressed, occupied less
than two seconds of time, and was undoubtedly attended with
great danger, owing to the fact that it was necessary for the
operator to guide forward with his hand the segment upon the
disc until it touched the convex surface of the pendulum to pre-
vent it from falling off by an invariable jar of the machine as it
started, when the segment would be drawn under it, carried for-
ward, and thereby pressed into proper shape.

From the evidence the jury were authorized to find that in the
working of the machine usually the first immediate movement of
the pendulum after pressing the treadle was forward, then in-
stantly backward, until it had accomplished its full swing each
way. The manifest danger that arose in using the operator's hand
in guiding the segment under the pendulum was from its liability
to swing backward quickly after the first movement towards the
operator, and required him to use extreme caution, even under
the ordinary movements of the machine, to withdraw his hand
before it could be caught between the pendulum and the disc.

The particular manner in which the operator was injured, under
plaintiff's claim, was in starting the machine while making use
of his hand in the customary way to guide the segment under the
pendulum, when, instead of its swinging toward the operator, as
usual, and thus enabling him to withdraw his hand, it instantly
went from him, carrying his hand with it, and crushing it between
the pendulum and the disc below. Besides the parts of the ma-
chine to which we have already directed attention, there were also
attached to and affecting the movements of the pendulum mechani-
cal contrivances consisting of gearing, cranks, and a revolving
wheel that may have influenced the uniformity and direction of its
movements in its starting from and stoppage at a particular point.
This last-described machinery was not within the view of the
operator when at work, and it may be that, had he known or could

he have observed its action he might have ascertained to a greater certainty the direction the pendulum would take when first put in motion, or perhaps, by observing the exact position of the pendulum when at rest before starting, he might have been better informed in this respect; but it is his claim, supported by evidence, that he had no knowledge of these essentials to a thorough understanding of the risks and dangers which such information would have given him.

There was evidence to show that the particular drawing machine on which plaintiff was injured started with a sudden irregular jar, though with a forward movement; also that such jarring motion was an incident of this, and not of the other, drawing machine in the same shop. It was also a peculiarity of this machine, as distinguished from the other, that large screws at material parts would become loose, and had to be tightened and adjusted during use from time to time, which duty was imposed upon the operator. Unless such adjustments were made when required, effective work could not be done in shaping the segments. There was also evidence tending to show that when plaintiff's son commenced work upon the machine he was instructed by the manager of defendant in the performance of his duties. The manager was with him more than a day, running the machine, to show the correct procedure in working the treadle and pressing the segments under the pendulum with the hand, during which time the usual movement of the pendulum towards the operator in starting when the segments were placed, was customary, and neither then nor at any time did the manager indicate that upon such required application of the hand in placing the segments the pendulum was liable to move immediately from him in starting it, or in any other way than the usual one heretofore described. Evidence of a proper character tended to show that the looseness of the parts, in connection with the effect of the obscured machinery upon its operation, tended to cause the irregular movement of the pendulum which is claimed to have been the direct and efficient cause of plaintiff's injury. This view may have been adopted by the jury.

We have signally failed in our efforts to describe the action of

the pendulum if it does not appear that, even under the most favorable conditions, and with the exercise of the very best judgment, its use was attended with extreme danger to the operator. Notwithstanding the existence of such danger, it would, as a matter of law, follow that with previous knowledge of the hazards incident to the service in which the operator was engaged, or of experience sufficient to enable him to appreciate the precise risk which he incurred therein, he must be held to the assumption of such risks, and denied a recovery, upon the ground that he had contributed to his own misfortune. It is the claim of defendant that such is the doctrine that rules this case; and that the evidence, as a matter of law, establishes the operator's assumption of the dangers incident to the use of the machine; but, after a careful review of the record, we are required to hold that this was a question of fact for the jury.

The relation of the master to the servant in the use of dangerous machinery would seem to be quite thoroughly and accurately settled in this and other courts. Without doubt the master is in duty bound to furnish reasonably safe and suitable appliances to the servant wherewith to perform his duties in the service he undertakes, but it is, in the first instance, to be presumed that an implement or instrumentality so furnished is safe for use and free from dangers of which the latter has no notice. Hence the servant has the right to act upon the assumption that the master has done his full duty in this respect, and therefore, when directed by proper authority to perform certain services, or to execute them in a certain way, or in a particular manner, upon the instrumentality furnished him for that purpose, he will ordinarily be justified in obeying orders without being charged with contributory negligence or with the assumption of risks from unknown dangers in so doing. Russell v. Minneapolis & St. L. Ry. Co., 32 Minn. 230, 20 N. W. 147; Hungerford v. Chicago, M. & St. P. Ry. Co., 41 Minn. 444, 43 N. W. 324. And the master's duty and liability in this respect extend not only to such unnecessary and unreasonable risks as are in fact known to him, but to such as he ought to know in the exercise of diligence. Cook v. St. Paul, M. & M. Ry. Co., 34 Minn. 45, 24 N. W. 311.

It may further be laid down as a principle resting not only upon authority, but upon manifest reason and justice, that, if there are peculiar conditions increasing the risk and hazards of using the instrumentality furnished liable to arise and occur in the performance of the servant's duty, the master is obligated to give the servant warning and information concerning the same, and this without reference to his age or other experience than has acquainted him with the dangers he incurs. Indeed, the age, knowledge, and experience of the operator in a case like the one before us are of importance only as evidence to be weighed by the jury in connection with all other circumstances tending to show his knowledge of the dangers of his employment. Madden v. Minneapolis & St. L. Ry. Co., 32 Minn. 303; Hawley v. Northern Co., 82 N. Y. 370; Wood, Mast. & S. (2d Ed.) § 359; District of Columbia v. Woodbury, 136 U. S. 450, 10 Sup. Ct. 157; Washington & G. R. Co. v. McDade, 135 U. S. 554, 10 Sup. Ct. 1044; Lund v. E. S. Woodworth & Co., 75 Minn. 501, 78 N. W. 81. While the lack of a specific warning or instruction regarding unknown dangers in the operation of a piece of machinery would not absolve the servant from responsibility or the assumption of the risk if he knew, or with the exercise of ordinary care could have known or appreciated, the hazard incurred, whether he did so or not is ordinarily a question of fact for the determination of the jury.

We have no doubt, upon the evidence in this case, that the question whether the plaintiff's son understood and appreciated the precise risk arising from the irregular, sudden movement of the pendulum presented a question of fact. It does not follow because he had imposed upon him the duty of adjusting the apparatus as it became loose from time to time that he would or could have acquired greater knowledge in this respect than would be observable to a man of ordinary intelligence, or that he actually knew that the looseness of the parts adjusted necessarily threatened danger, and involved the peculiar risk which resulted in his injury. If, lurking in the obscure conditions of the machinery, were causes that occasioned the unexpected and immediate backward movement of the pendulum upon starting the machine, he might not necessarily know of that possibility, unless informed or warned

thereof; for the verdict justifies the view that the jury must have found that plaintiff's son received no warnings of the specific risks occasioning his injury, and therefore did not appreciate the same.

Hence whether, in this intricate machine, requiring constant attention for the purpose of properly pressing the segments, the operator should have apprehended additional danger from an irregular movement and exercised extra caution on that account, was a question for the jury, since it does not follow as a matter of law that the operator must have known or discovered, in the length of time which he is shown to have worked upon the machine, the extreme hazards he was constantly incurring from the causes stated; and the jury may reasonably have concluded that the usual and ordinary tendency of the pendulum to move forward on starting, as well as the regular action of the corresponding machine upon which the operator had worked, may have, to a certain extent, misled him, with an assurance of safety in the use of a defective and unsafe machine in many respects similar to the other one at which he had also worked.

It is urged that the verdict of $5,000 is excessive. Without unnecessary recurrence to the many details of physical suffering and injury in the record, it may generally be stated that the heavy mass of metal described as the pendulum passed over the entire left hand to the wrist, crushing it severely, so as to require a skilful, but exceedingly painful, surgical operation to save it from entire ruin. Blood poisoning set in, causing a high fever, with severe pain and constant medical treatment for a considerable time. The palm and back of the hand, with the tendons, muscles, and bones, were torn and lacerated. Another painful operation may still have to be performed to secure the best results. One of the physicians attempting to measure the utility of the hand said it had lost half its use. The jury might have thought, upon the question of the probable usefulness of the hand in the future, that the injury to it was much greater. Upon the entire evidence, regarding the injuries as well as the somewhat extensive details of the accident and subsequent treatment of the hand, we should be at a loss to say, were we so required, what would be the exact compensation the plaintiff should receive. This was peculiarly a

question for the jury, and the amount awarded has met with the approval of the learned trial court who heard the evidence and saw the mutilated member. The recovery is within the range in amount of verdicts for injuries not more serious heretofore sustained by this court. The plaintiff's son was a young man nineteen years of age, depending upon manual labor for his livelihood, and numerous occupations of life of this character must be closed to him. We find no evidence in the record that indicates passion or prejudice on the part of the jury, or that would justify us in setting aside the verdict on that ground, and we must decline to disturb it.

Several assignments refer to the instructions given by the trial court, but we find no reason for criticism of the charge. The remaining assignments present nothing novel, or that necessarily require particular attention.

The order appealed from is affirmed.